This is the obvious reason why the Batman-W갈mar battle scene is the best.   He truly did. Next case is Robert Chapman et al versus Michael Lawrence Kasner et al, 2008-14-27, Mr. Robinson. May it please the court, this is a case where Chapman's method claims were incorrectly found obvious over a combination of references. The claim method includes only three steps. Mixing oxycodone with an acid in the solvent, that's absent from the prior art, incubating an oxycodone mixture, which is again absent from the prior art, and exposing the oxycodone mixture to certain reagents, which is also absent from the prior art. All of the prior art actually left off where Chapman's claims begin, with oxycodone as a starting material. There is no proper reason to combine references here, as the board did, and then to apply them to an oxycodone solution. Neither the real problem nor... Starting with oxycodone, which is your product, just not pure, and then you're subjecting it to acid, which, if there's a dihydroxy compound there, will dehydrate, so you end up with a 14-hydroxy compound, and then you hydrogenate that. All those steps are known. The steps were not known in application to oxycodone, nor was there any reason to apply it, because what was known in the prior art from Weiss was that if you took oxycodone, if you took 814-hydroxy, the only known 814-hydroxy at the time, and subjected it to salting at the time, under commercial conditions, or under conditions that one would use in a commercial setting, that it turned into a benign salt. It's the discovery of another impurity that was made during thebane oxidation. It's actually the discovery... The way it actually worked, really, was the discovery of 14-hydroxy in the salted product, which everyone thought was disposed of by hydrogenating the 14-hydroxy before, and then going back and finding out that this was caused by a different impurity that no one ever knew or suspected existed that was actually Chapman's invention. This... Well, are you referring... You're referring to the 8-alpha, the discovery of the 8-alpha, right? Yes. And then under the commercial conditions. What I'm having a hard time seeing is where in your application, or in the claim language itself, is there a reference to the 8-alpha or to the commercial conditions? Well, in the application itself, if you look at Figures 1 and 2, particularly Figures 1 and 2, the description of the drawings, and paragraphs 43, 46, and 47, you'll see the schematic of where it shows that when you oxidize thebane, 8-alpha is formed. That is Chapman's discovery. And then you'll see also that 8-alpha is converted to 14-hydroxy. That's in Figure 2. And where is that in Claim 96? Where is that in the Claim 96? It's not... There's no reason for that to be in Claim 96. This was the background of the invention. First of all, no one applied these steps to oxycodone before Chapman did, and there was no reason to do so. This is a combination of references. Now also, in the application, we're allowed to claim up to the prior arc, as long as we've disclosed that. We have claimed up to the prior arc. If there is no reason to combine the references, then there is no reason at all for the prior arc to disclose what's in Chapman's claim, even though the claims are not restricted only to 8-alpha. Well, your claim starts with oxycodone. Starts with oxycodone. It ends with oxycodone. The only reason to do that is because your starting oxycodone is not pure, right? People knew that oxycodone was not pure. However, they did not know what the impurity was. The molecule itself was the impurity. So you're saying there was a discovery. But if a process which capitalizes on a discovery consists of known process steps, the discovery isn't patentable? Only if the known process steps were identified and predictable and finite. And there was nothing predictable here, because there was nothing predictable to show that 8-alpha would turn into a 14-hydroxy compound under commercial conditions. It was known from the prior arc that the previously known impurity, 8-beta, would turn into a stable benign salt, which was not a problem in oxycodone. Really what was happening here, and no one knew it before, was that 14-hydroxy from a new source was being created. That source was unknown. And frankly, the fact that 14-hydroxy, new 14-hydroxy, was being created was unknown. Everyone in the arc thought that it was just carryover, old 14-hydroxy, from incomplete hydrogenation. Therefore, the logical thing to do... What you want to claim is we claim that some commercial materials of oxycodone unexpectedly carry an 8-alpha hydroxy impurity. Well, oxycodone salts. In other words, when you salt oxycodone... That's not patentable. It's a discovery. No, it's a discovery of a problem, and then we invented a solution. The solution consists of several process steps, which, separately at least, are known. When you subject a dihydroxy to acid, you dehydrate. And then once you get the 8-9-dehydro material, and you want to get rid of the double bond, you hydrogenate. But there was no reason to combine those steps or to apply it to oxycodone because the prior arc did not disclose the existence of a new 14-hydroxy or the existence of 8-alpha. This is classic use of hindsight. Back to the discovery again. No, this is classic use of hindsight. What you're saying is that because one knows that there is an impurity here that has a double hydroxy, and because it converts to a 14-hydroxy with a double bond, then one would do these two steps. However, there was no reason to put these steps together or to apply them to oxycodone until the discovery underlying the claim. But aren't you still just applying well-known hydrogenation steps? The actual solution itself is fairly simple once you understand the problem. However, no one understood the problem, nor did anyone have any incentive or reason to dig into the problem the way that Chapman did. There was a common belief that you just needed to hydrogenate away, and that really wasn't what was going on. The question is whether the prior arc recognized the cause of the problem, which is precisely what this court's predecessor held in In re Spinoble. In In re Spinoble, we were talking about a stopper in a bottle, and basically the difference was that moisture was going through the stopper rather than going around the stopper. You needed to use a different type of rubber, which was well-known, and use silicone, which was well-known. But nobody recognized it. Is that a composition claim? That was a composition claim. Eyeble, on the other hand, was a process claim. Same thing in Eyeble. All that was known in Eyeble was the fact that there was a goal. The goal was defect-free paper. The goal here is 8-buck-free commercialized oxycodone. The problem in Eyeble was waves and ripples in the traveling wet feed, and the cause, which nobody could figure out before, was mismatched speed. Now Eyeble just applied gravity. Everybody knew to apply gravity. All you did was elevate and lower the wire and the feed, but there was no reason to apply gravity in that particular process until one knew of the problem, which nobody knew of before, and knew of the cause of the problem. So many steps are old steps. However, there's no reason to combine them or apply them to a particular process or to a particular product until you know something about the problem or the cause of the problem. Even KSR says this, really. It says when there are a finite number of predictable solutions. Here, no one could know about any predictable solution or know of any solution because 8-alpha was unknown and nu-14-hydroxy was unknown. This is completely consistent with KSR. 8-beta was known, wasn't it? 8-beta was known, but it had different properties. On top of that, no one knew. Even though people knew of 8-beta, no one knew of 8-alpha. Even Professor Stork, a Kessler's expert, said... Don't you want to get rid of 8-beta as well as 8-alpha? No, you don't, because 8-beta turns into a benign salt. It does nothing. You can eat as much of this salt as you want and nothing will happen to you. Unfortunately, 8-alpha, Chapman's new discovery... The product doesn't contain 8-beta, so you have to get rid of that anyway. The product can contain 8-beta salt carried through. It's possible. These reactions don't go through to completion. You can get rid of it similarly by dehydration and hydrogenation. No, actually, in the salt, you don't get rid of it because in the salting process it becomes a stable benign salt. So when it's salted, it doesn't react at all. There's no 8-beta left. All there is is 8-beta salt, which is unreactive. If you dehydrate, you remove it. If you dehydrate, you may remove it. But this is what was going on in the art. The art was taking the 8-beta that was carried through to the salting step and making that into a stable benign salt. So there was absolutely no reason. What you found in your product of oxycodone, really, at the end of commercial production, was a stable benign salt of 8-beta and 14-hydroxy, which you had no idea where it came from. Doesn't Weiss treat 8-14-dihydroxy, meaning 8-beta, with HCl to produce 14-hydroxy, which is a dehydration reaction? It treats 8-alpha-14-dihydroxy. Correct. But it treats it at a very high concentration. In Weiss, the 8 was alpha? The 8 there was beta. That's what I just said. The 8 was beta. I thought you said 8-8-8. So it was in the art that you dehydrated. But it only treated... It showed two reactions there, really. It showed that when you treated it at high concentrations of acid, 50-50, at high temperature, you got a 14-hydroxy. But when you treat it under something that would be closer to commercial conditions, which was 2-normal HCl, you got a stable benign salt. Therefore, the teachings, actually, of Weiss would teach away from what Chapman was doing, because it would say, when you did this under commercial conditions, if you even knew of 8-alpha, you would likely get a stable benign salt. Chapman discovered that you did not. You got something else. Now, this court should take notice of the fact that reactions are generally run under milder conditions, because complicated molecules like this are degraded when they're subject to harsh conditions, as in the treatment of 8-beta with 50-50 hydrochloric acid in Weiss. Furthermore, that in order to increase yield, you try and run reactions under very mild conditions in commercial setting. So really, the art that we're dealing with here is commercial pharmaceutical production. The board actually found that. Kasner agrees, and in that instance, we found a prior art compound reacted completely differently than Chapman's new discovery. We are into your rebuttal time. Would you like to save it? Yes, please. Thank you. Is it Nemec? Yes, Your Honor. Nemec. Please proceed. Thank you. If you please the court, I'd like to begin with Kasner's position that this distinction between the 8-alpha and the 8-beta isomers is a new argument being raised for the first time. You're in the unusual position of arguing the unpatentability of a process that you sought a patent and obtained a patent for. Yes and no, Your Honor. Kasner did obtain the 966 patent based on a process for purification of oxycodone to remove the 14-hydroxycodone impurity. That was developed following a directive from the FDA that the companies in this industry had one of two choices. They could either get rid of the 14-oxycodone in their products or they could submit additional clinical data. Both Purdue and Johnson Matthey, the real parties in interest in this case, chose to further purify their materials and both, within a period of less than a year, arrived at essentially the same solution. The difference is in the way that the two parties have claimed their approach. On the one hand, Chapman has claimed essentially two generically recited reactions. The first step being converting the 814 dihydroxy to 14-hydroxycodone and the second step being converting the 14-hydroxycodone to oxycodone. Mr. Robinson says the discovery of the problem, Sponobel, is the key here. And he discovered it, or his client discovered it. We have two issues with that, Your Honor. The first is there's no indication in the specification of the 897 application, the Chapman application, or any of its priority applications that that, in fact, is the discovery. The specification doesn't say we've surprisingly discovered that there's another isomer of 814. It's the alpha isomer. It doesn't say we've surprisingly discovered that this 8-alpha isomer has different properties than the 8-beta isomer. It doesn't say that the 14-hydroxy arises by virtue of this 8-alpha isomer as opposed to being carried over through the process. And importantly, neither the specification nor any of the expert evidence that's been submitted indicates that there is, in fact, a difference in the properties, a difference in the behavior of the two isomers when submitted to the conditions called for in either of the two, or otherwise. The other issue with respect to the discovery is we would submit... Why isn't this controlled by EIBL? They're the one who recognized the problem, and by recognizing the problem, then you, of course, do apply a prior art method to solve it, but no one knows you even had to solve the problem until they identified it. Well, the difference, Your Honor, is in what exactly the prior art contains in EIBL versus what the prior art contains in this case. I would submit that the board correctly identified the problem that both parties were facing as the presence of this potentially toxic 14-hydroxycodone in commercial oxycodone products. So the board sets the table with the person of ordinary skill in the art faced with this problem looking to the prior art as to what might help them to remove this impurity. And there are a variety of teachings in the prior art. There's a teaching that 14-hydroxycodone can be removed by virtue of hydrogenation. That's actually even taught in the specification of the 897 patent. It's not really claimed that getting rid of... What's the problem I'm talking about is the removal of the alpha, 8-alpha isomer, which they only identify. Correct, Your Honor. With regard to the 814... It's what's causing the paper to crumple. And so they solved the problem with a known method. You just incline so the speeds match. Use gravity to compensate for the speed mismatch. Here they use the known methods of hydrogenation, but you didn't know you had to do it until you knew there was 8-alpha there, right? And so they are the ones who solved the problem. With due respect, Your Honor, the situation is a bit different. In the Eibel case, there was no indication in the prior art that the speed mismatch was the cause of the ripples and the defect. Is there anything to indicate that there was an 8-alpha in the prior art in this case? Not in the record in this case, and that's why it's such a problem that we're now faced with the 8-alpha issue for the first time on appeal. There was no shortage of expert testimony and expert declarations in the case below, and on no occasion did Dr. Baldwin, Chapman's expert, distinguish the prior art that had been brought forward on the basis that it taught only 8-beta, and that's really not relevant to the issue here because the invention is 8-alpha. That was never surfaced. The appellant points to the Proxia reference, which was turned over in a reply brief. For the first time in the opposition briefs that Chapman submitted before the board, they were the first to discover that 8-14 was this rogue by-product that was giving rise to the 14-hydroxycodone in the commercial product. In reply... If we read their claim, as was pointed out a moment ago, to identify the 8-alpha component as the problem, then do you lose? I apologize, Your Honor. If we read their patent to have sufficiently disclosed that the problem is 8-alpha, which they're solving with these prior art methods, does this fall under Eibel and you lose? No, Your Honor. I would submit that the onus was on Chapman to bring forward evidence that the prior art teachings with respect to the 8-beta isomer were not applicable to the 8-alpha. That's the presumption in my question. If we read their patent to disclose the 8-alpha problem, and they have disclosed it and disclosed that the solution is their process, then they have contributed something to the art, have they not? I would submit that they have not, Your Honor. Why not? If we follow the reasoning of the Aventis case and the In re Wilder case with regard to a presumption as to the properties of isomers, in the absence of rebutting evidence, proof of the properties of one isomer are presumed to apply to another isomer. Now we don't submit that those cases are... You're saying the 8-beta and the 8-alpha are equated, but they're not. The 8-beta is harmless in this salted condition, and the 8-alpha is not. They're different. That's not necessarily correct, Your Honor. The prior art references that were brought forward, starting with Wiebach, shows that under certain conditions, the 8-14 will convert to the potentially toxic 14-hydroxycodone. Weiss teaches the same. Ejima and Tada, interestingly, these references were not directly urged in connection with the obviousness determination below, but what they do show is that the circumstances under which 8-14 will convert to 14 and vice versa are not necessarily clearly defined in the prior art. So it is not safe to assume, and a person of ordinary skill in the art with all this prior art before them would not have assumed that the 8-14-beta was a harmless or potentially harmless byproduct. The teachings in the prior art show that, in fact, under conditions of treatment with acid, the 8-14 can convert to the 14. Does Chapman's application indicate that 8-alpha was the problem? It does not, Your Honor. In our view, it does not. The 8-alpha is referenced in the Chapman application. The figures show a conversion of the 8-alpha to 14-hydroxycodone, but very clearly the Chapman application says that 8-14 dihydroxy is defined as either isomer or a combination of both. So it doesn't spotlight alpha as the problem? Correct, Your Honor. And I believe Chapman concedes that from a claim construction standpoint, and this comes from pages 26 and 27 of the reply brief, that the claims would not be limited to any particular isomer. I'm a little unclear on what your waiver argument is. What are you saying that they waived the ability to argue here on appeal? Our position is that this distinction between the isomers was not properly presented to the board. And if we look at the progression of evidence below, I think that becomes clear. And so you're saying the board, therefore, didn't construe the claims as covering the 8-alpha? Therefore, where did the board go wrong, or how did the board differ in its construction? I don't think the board went wrong at all. From Kassner's standpoint, the board reached the correct determination. The difficulty is that the issue was not framed for the parties to fully explore. In other words, you're saying if he's relying on 8-alpha as the problem, which he solved, that wasn't expressed in the specification or argued below. Is that your point? Correct, Your Honor. It was not argued in the specification. In the first declaration that Dr. Baldwin submitted, he did, in fact, identify that it was 8-alpha. But then he went on through the remainder of the declaration to speak of the two isomers together. In the second Baldwin declaration, Dr. Baldwin- Had anyone identified the 8-alpha isomer at all before Chapman? I don't have any information on that one way or the other, Your Honor. And that is one of the difficulties here, is had it been made clear in the proceedings below that Chapman believed this is what its invention was, either in the specification itself or through the presentation of expert testimony on behalf of Chapman, certainly there would have been some investigation undertaken to see whether, in fact, the 8-alpha isomer behaves any differently. What about figure 1? Doesn't that pinpoint 8-alpha? It does, Your Honor. Isn't that contrary to what you just said earlier? No, Your Honor. We certainly don't dispute that figure 1 in the 897 application shows 8-alpha. Figure 2 in the specification also shows 8-alpha. But if we look at page A914 of the record, this is a preference from the specification of the 897 application. Chapman is instructing the Patent Office and instructing the public. The term 8-14-dihydroxy-7-8-dihydrocodinone includes either 8-alpha-14-dihydroxy or 8-beta-dihydroxy or can include a mixture of both compounds. But figure 2 shows the dehydration of 8-alpha-14-dihydroxy to 14-hydroxycodinone, which is, by hydrogenation, becomes the precursor to the product. So it does specify 8-alpha being dehydrated. Why would it specify that if that isn't the problem? Well, I would submit that figures 1 and 2 are examples of this relationship. There's nothing in the specification to tell the person skilled in the art who, if we accept Chapman's position that 8-alpha was not known before, this person skilled in the art would have no idea whether Chapman's saying, this is different from the 8-beta equation, this is the same, and the passage that I just read would suggest to the person skilled in the art that, in fact, the relationship would be the same. Now, you make the same argument on waiver with respect to the commercial conditions issue, raised on appeal here, too. Do you want to cover that briefly? Correct, certainly.  And Weiss, where from Chapman's standpoint, the conditions to which the 8-14-dihydroxy were treated, extremely acidic conditions, higher temperatures, the argument is that that wouldn't be applicable in commercial conditions. Person skilled in the art really wouldn't take anything away from those references as bearing upon the problem at issue. And our position is that this concept of the person of ordinary skill in the art being focused only on prior art teachings in a commercial setting was not framed before the board. Would you characterize this as particularly unpredictable arts, where it is difficult to absolutely predict the outcomes of particular processes on particular starting materials? Your Honor, I can only take my lead from the views of the experts in the record. And I would submit that Dr. Baldwin, consistently throughout his expert testimony in the case, Dr. Baldwin being the expert for Chapman, took the view that, in fact, these equations, these processes are predictable. And now, interestingly, as a backdrop to this, a major argument that Kasner was advancing below is that there was not sufficient support under Section 112 for the broad claims in the Chapman application to say conditions suitable for a particular reaction or conditions sufficient to perform a particular reaction was not enough to put one of skill in the art on notice as to what exactly the parameters would be to sufficiently carry out those reactions. Now, that argument, I would submit, and this is really not an issue before the court, but if, in fact, we're talking about a conversion of an unknown isomer, 8-alpha, to 14-hydroxycodone, and we're told, not through any expert testimony, but I would submit only through attorney argument, that the properties of this isomer are different from those of the known isomer, this 112 issue becomes even more problematic. How would one skilled in the art faced with a brand new isomer that they're told has different properties know what these conditions suitable are to perform the reaction? So the expert testimony, as it developed in the record, certainly from the Chapman side, was consistently to the effect that the 8-14 to 14 and then the 14 to oxycodone reactions are predictable, that a person skilled in the art told you should perform these two sequence of reactions would know what parameters were appropriate. At the outset, Kassner's expert, Dr. Stork, took the position that that would not necessarily be clear to a person skilled in the art, and he pointed, in fact, to some of the references discussed in the briefing here, the Ajima and the Tada references, to say you can't count on the fact that any given set of reaction parameters will actually allow these reactions to proceed. Now, as the record developed and as more information was found in the prior art, it became clear that at least a certain set of the reaction conditions would certainly be obvious and known to a person skilled in the art based on references such as Wiebach and Weiss. Thank you, Mr. Nemec. Thank you, Your Honor. Mr. Robinson. Let me ask you, Mr. Robinson, I see references in your specification to 8-alpha and the figure 1 and figure 2, yet in the description of the drawings they're referred to as 8-14-dihydroxy, no focus on 8-alpha. Same with figure 2, and when I look at claim 96, which is, I guess, the count here, refers to 8-14-dihydroxy, again, no focusing on 8-alpha, which you're now telling us is the real source of the patentability here. The focus on 8-alpha is right up front, really, in figure 1 and figure 2. Figure 1 and figure 2 show you that 8-alpha reacts differently than 8-beta as found in Weiss. One of the ordinary skill in the art is reading this, and in light of the prior art, and the prior art before you, before one of the ordinary skill in the art is Weiss, which says that 8-beta, under these kinds of conditions, does not act this way. So, really, it is highlighted here to one of ordinary skill in the art. As far as 8-alpha being a new argument, 8-alpha was for the board in many instances, firstly, in figures 1 and 2, secondly, in the description of the figures, thirdly, in paragraphs 43, 46, and 47. Secondly, PROXA, which really highlighted this argument, was not raised until the reply briefing. We never had an opportunity to brief that. One of the reasons that an appellate court may look at something like this is under special circumstances, particularly where the one party did not have a chance to address this. However, if you look at Professor Baldwin's last declaration, and that's Appendix 787, Paragraph 34, if you look at Professor Baldwin's first declaration, Appendix 331, Paragraph 33, Appendix 331, Paragraph 34, his second declaration, A777-90, he describes figures 1 and 2. The board didn't rely on any of that expert testimony, did it? The board relied extensively on Professor Baldwin, but the board went in a wrong direction, actually, when it started talking about market demand, and market demand being the motivation. Market demand was a goal, and our position is that market demand is a goal, which alone is not a sufficient reason under KSR to combine references, particularly when the combination did not explain the appearance of the new ABUC in the commercial SALT. The board really tried to stick the market demand as the only reason for actually looking to see whether or not one could do this, and then, therefore, one did that. What the KSR court says was, when there's a design need or market pressure to solve a problem, and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue those non-options within his or her technical grasp. But here, there were no identified or predictable solutions, since neither of Chapman's discoveries were known. Now, I find it rather odd that Mr. Nemec, at one point, says... Did you say that in your specification at any point? This is our invention, 8-alpha is the problem, and here's how you solve it? There is nothing in the specification that says, we found that 8-alpha is the problem. No. However, 8-alpha is right up front, and 8-alpha, one of ordinary skill in the art, knows what's in the prior art, and 8-alpha was not in the prior art. It is evident to one of ordinary skill in the art reading this, that 8-alpha is something new. Something new may be on appeal here. Were you counsel at the board level? Yes. I'm looking at the board opinion, and while I see one mention of 8-alpha descriptively, all the discussion is of 814 dihydroxy, without indication of alpha versus beta. And this discussion... Was this focus on alpha mentioned and argued at the board level? It was mentioned and argued at the board level, but it did not become important until PROXA became a reference, and that's when we submitted declarations to that, and also asked the board to preclude PROXA, because we didn't have a chance to argue. However, this does fall under the exceptions of the FICASE case and some of your other case law, where we did not have the chance to argue below a particular point, and where we should be able to argue it now. It's been fully briefed. Both sides have addressed it completely. Just as commercial conditions were completely addressed, the board found that there was a commercial need to reduce the amount of 14-hydroxy in oxycodone, therefore we're talking about commercial production. And Johnson Matthey said that Chapman's discovery of 814 dihydroxy is also formed during the preparation of commercial oxycodone was known in the art. That's Johnson Matthey's brief, Kessner's brief. Mr. Robinson, you may not have noted your red light is on. I'm sorry. Do you want to finish your sentence? I'm finished. Okay.